# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

FILED

FEB 0 4 2014

U.S. DISTRICT COURT-WVND
CLARKSBURG, WV 26301

**TRENA MAY BATES,**

     **Plaintiff,**

**v.**                                   **Civil Action No. 1:13CV122**
                                          **(The Honorable Irene M. Keeley)**

**COMMISSIONER OF SOCIAL SECURITY,**

     **Defendant.**

## REPORT AND RECOMMENDATION/OPINION

Trena May Bates ("Plaintiff") brought this action pursuant to 42 U.S.C. §§ 405(g) for judicial review of the final decision of the Commissioner of the Social Security Administration ("Defendant," and sometimes "the Commissioner") denying the Plaintiff's claim for disability insurance benefits ("DIB") under Title II of the Social Security Act. The matter is awaiting decision on cross motions for summary judgment and has been referred to the undersigned United States Magistrate Judge for submission of proposed findings of fact and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b); L.R. Civ. P. 9.02.

## I. PROCEDURAL HISTORY

Plaintiff protectively filed an application for DIB on July 25, 2010, alleging disability since September 7, 2009, due to osteoarthritis, chronic obstructive pulmonary disease ("COPD"), carpal tunnel syndrome, depression, and anxiety (R. 134, 153, 164). Plaintiff's application was denied initially and upon reconsideration (R. 84, 85). Plaintiff requested a hearing, which Administrative Law Judge Mark Swayze ("ALJ") held on January 19, 2012. Plaintiff, who was represented by counsel, John DePolo, testified on her own behalf. Also testifying was Vocational Expert ("VE") Dr. Larry Ostrowski and Plaintiff's husband (R. 35-83). On February 6, 2012, the ALJ entered a

decision finding Plaintiff was not disabled (R. 15-31). On February 26, 2013, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner (R. 1-6).

## II. FACTS

Plaintiff was born on November 9, 1965, and was forty-six (46) years old at the time of the administrative hearing (R. 43). Plaintiff finished the ninth grade of high school and completed cashier training through Salem College SCOPE and manager training through Popeyes Louisiana Kitchen (R. 46-47). Plaintiff's past relevant work included supermarket cashier, census form distributor, retail store cashier, newspaper delivery person, gas station cashier, security agent at a WalMart parking lot, and gas station assistant manager and manager (R. 49-53).

Plaintiff's December 3, 2009, x-ray of her right knee was unremarkable (R. 244). The x-ray of her left knee was unremarkable, except for a "minimal degenerative change without significant joint space narrowing (R. 245).

Plaintiff's March 13, 2010, left knee MRI showed a small popliteal cyst, "some subcutaneous edema ventral to the patellar tendon," and minimal osteophytes (R. 248).

Dr. Watkins referred Plaintiff to Dr. Courtney on May 18, 2010, for evaluation of Plaintiff's knee pain (R. 333).

Plaintiff's July 21, 2010, right knee x-ray showed no abnormality (R. 249). Her left knee showed "[m]inimal loss or arthritic change was slight spurring the posterior patella but no evidence of joint space narrowing" (R. 250).

Bryan Stanislaus, PA-C ("P.A.") at United Hospital Center ("UHC") Orthopedics, evaluated Plaintiff on July 21, 2010, for bilateral knee pain. Plaintiff reported she had received injections in

both knees two (2) years earlier, and she realized four (4) months of pain relief therefrom.  Plaintiff reported that she had not "had successful injection attempts" since that time.  She treated her pain with Tramadol, which "offered her little or no relief."  P.A. Stanislaus reviewed Plaintiff's knee "radiographs" and noted they showed "mild bilateral degenerative joint disease/medical compartment narrowing" but no other abnormalities (R. 335).  Plaintiff was diagnosed with bilateral knee degenerative joint disease (R. 336).  P.A. Stanislaus prescribed Daypro to Plaintiff and informed her that if she did not realize any relief from that medication, she should return for corticosteroid injections (R. 335).

Dr. Watkins examined Plaintiff on September 13, 2010.  Plaintiff reported she was "under a lot (sic) of stress lately."  Her aunt had died, and she and her family had been living with a "mentally abusive uncle."  Plaintiff stated she had had thoughts of "wrecking her van [with] only her in it."  Plaintiff had left knee tenderness, intermittent right pelvic pain, and lung wheezes.  Dr. Watkins noted Plaintiff's thoughts were linear and logical.  She made eye contact.  She was anxious and tearful.  Plaintiff promised to "keep self safe" (R. 315).  Dr. Watkins diagnosed sinusitis, anxiety, depression, epigastric pain, pelvic pain, and COPD.  Dr. Watkins prescribed Celexa, Nexium, and Proventil inhaler.  Dr. Watkins encouraged Plaintiff to stop smoking (R. 316).

Plaintiff informed Dr. Watkins on October 11, 2010, that she had "applied to be custodian at FSU but . . . [could not] climb/crawl on floor b/c arthritis."  Plaintiff was fatigued.  She experienced tingling and numbness in her lower back and legs.  Plaintiff experienced weakness and fell.  Plaintiff's back pain was exacerbated with lifting and standing "in one spot."  Plaintiff reported she had bilateral carpal tunnel syndrome.  Plaintiff reported she had a cough; her lungs had scattered wheezes.  Dr. Watkins found Plaintiff's peripheral pulses were intact.  She had tenderness and

spasms along her lumbar spine. She had crepitus in her knees. Her strength was 5/5, except for bilateral hip extension, which was 4/5. Dr. Watkins found Plaintiff's mood was improved (R. 313). Dr. Watkins diagnosed chronic low back pain, carpal tunnel syndrome, and allergic bronchitis. Dr. Watkins found Plaintiff's pain was "fairly controlled" with Daypro. Dr. Watkins ordered x-rays and referred Plaintiff to physical therapy. Dr. Watkins referred Plaintiff to a neurologist for an electromyogram ("EMG"). Dr. Watkins recommended Plaintiff obtain and wear wrist braces at night (R. 314).

Plaintiff's October 11, 2010, lumbar spine x-ray showed degenerative changes, especially at L4-L5 (R. 317, 369).

Martin Levin, M.A., completed a psychological evaluation of Plaintiff on October 12, 2010. Mr. Martin noted Plaintiff drove to the evaluation; she was accompanied by her husband. She held a valid driver's license, which she obtained by passing the written test. During the evaluation, Mr. Levin observed Plaintiff to be cooperative, pleasant, and anxious. Plaintiff's posture and gait were normal. She needed no assistance with her mobility (R. 259). Plaintiff stated her chief complaints were asthma, back pain, carpal tunnel syndrome, arthritis in her knees, depression, and anxiety. Plaintiff reported she had mood swings that included "both manic and depressive episodes." She stated she experienced decreased memory, decreased concentration, decreased energy, loss of interest in activities, and decreased libido. Plaintiff stated her sleep was poor; she had difficulty falling asleep and staying asleep. Plaintiff had decreased appetite. She experienced crying spells two (2) or three (3) times per week. She stated she had suicidal thoughts. She had attempted suicide after her second husband died by taking an overdose of pills. Plaintiff stated she had "full panics that include hyperventilation, tachycardia, high blood pressure and feeling as if she [was] having a heart

attack." Plaintiff reported she had been treated with therapy and medication at United Summit Center ("USC") for six (6) months and that treatment "helped a little." Plaintiff had received the same care in South Carolina for one and one-half (1 ½) years. Plaintiff medicated with Albuterol, Citalopram, Oxaproxin, Proventil HFA, Advair, and Nexium (R. 259.)

Upon examination, Mr. Levin found Plaintiff's speech was normal. Her thought processes and content were normal. Her mood was depressed; her affect was restricted. She was oriented as to person, place, time, and circumstance. She did not have hallucinations or illusions. Her insight was normal. Her psychomotor behavior was normal. Plaintiff's judgment was normal, and Mr. Levin based this finding on Plaintiff's "response to the 'letter' question from the Comprehension subtest of the WAIS-III." Plaintiff had thoughts of suicide. Plaintiff's immediate memory was within normal limits; her recent memory was within normal limits; her remote memory was moderately deficient. Plaintiff's concentration was "severely deficient." Plaintiff's persistence was within normal limits. Her pace was within normal limits. Plaintiff behaved in a "socially appropriate manner" during the interview. Plaintiff stated she was comfortable in public (R. 260).

Plaintiff listed the following activities of daily living: rose at 5:00 a.m., brushed her hair and washed her face; made iced tea; did some house work; ate in the afternoon; cooked family meals; helped her husband with his appointments; read; took her children to their activities; attended church a few times; and cared for her personal grooming (R. 260).

Mr. Levin diagnosed the following: Axis I - bipolar disorder, most recent episode depressed, moderate, and panic disorder without agoraphobia; Axis II - no conditions present; Axis III - asthma, COPD, carpal tunnel, and arthritis by report. Mr. Levin based his diagnoses of bipolar disorder and panic disorder on Plaintiff's symptoms. Plaintiff's prognosis was guarded. Plaintiff was competent

5

to manage her own finances (R. 261).

October 18, 2010, Dr. Nutter completed an internal medical examination of Plaintiff. Plaintiff reported she experienced constant joint pain.  Plaintiff reported she had had "injection[s]" in her right and left knees.  Standing, walking, kneeling, squatting, and climbing up and down stairs exacerbated Plaintiff's knee pain. Plaintiff fell because her knees gave out. Plaintiff's shoulder pain was exacerbated by pulling, reaching overhead, reaching out, lifting, and repeated use.  Plaintiff reported foot numbness and numbness in both arms from her elbows to her fingers (R. 262). Plaintiff reported she was allergic to Darvocet; she medicated with Nexium, Advair, Oxaproxin, Citalopram, a nebulizer, and Proventil (R. 262-63).    Plaintiff smoked three-fourths (3/4)of a pack of cigarettes per day.  Plaintiff reported she had lost fifty (50) pounds in the past six (6) months. She had shortness of breath, wheezing, and coughing.  She had not been hospitalized for breathing problems. Plaintiff had lumbar back pain, which was constant and radiated down her right leg.  It was exacerbated by bending, sitting, standing, lifting, vibration, coughing, and sneezing.  Plaintiff was four (4) feet, eleven (11) inches tall and weighed one-hundred, sixty-nine (169) pounds.  Her body mass index was thirty-four (34).  Upon examination, Dr. Nutter found Plaintiff's gait was normal; she did not need assistive devices to ambulate.  She was stable at station and comfortable in both the supine and sitting positions.  Her intellectual functioning was normal throughout the examination.  Her recent and remote memories of her medical history were "good."   Dr. Nutter found Plaintiff's head, ears, neck, and throat examinations were normal (R. 263).  Plaintiff's chest examination was normal, except for mild expiratory wheezes of the lungs. Plaintiff's cardiovascular examination was normal.  Her abdominal examination was normal, except for moderate obesity. Dr. Nutter's examination of Plaintiff's right shoulder, right wrist, and left shoulder showed "evidence

of pain with movement and tenderness." Plaintiff had no redness, warmth, swelling, tenderness, crepitus or laxity in the rest of her upper extremity joints. Plaintiff's elbow and wrist Tinel's signs were normal, bilaterally. Plaintiff's ranges of motion were as follows: right and left shoulders - one-hundred, eighty (180) degrees forward flexion and abduction and ninety (90) degrees internal and external rotation; right and left elbows - one-hundred, fifty (150) degrees flexion and zero (0) degrees extension; right and left wrists - seventy (70) degrees flexion and sixty (60) degrees extension. Dr. Nutter's examination of Plaintiff's hands showed no atrophy; she could make a fist; she had no Heberden's or Bouchard's nodes; she could write and pick up coins. Plaintiff had pain and tenderness in her second, third, fourth, and fifth fingers. Plaintiff had reduced grip when measured by the Odynometer; "however, during the physical exam when asked to squeeze [Dr. Nutter's] hand she was able to squeeze [his] hand equally well." Dr. Nutter found Plaintiff's grip strength was 5/5, bilaterally. Dr. Nutter found Plaintiff had bilateral knee pain and tenderness with movement. Dr. Nutter found Plaintiff had no tenderness, redness, warmth, swelling, crepitus, or laxity in the "rest of the lower extremity joints except as noted above." Plaintiff's right and left knee ranges of motions showed one-hundred, thirty-five (135) degrees flexion and zero (0) degrees extension. Plaintiff's right and left ankles showed forty (40) degrees plantar flexion and twenty (20) degrees dorsiflexion ranges of motion (R. 264). Dr. Nutter's examination of Plaintiff's cervical spine was normal. The ranges of motions were as follows: fifty (50) degrees flexion, sixty (60) degrees extension, forty-five (45) degrees left and right tilts, eighty (80) degrees left and right rotations. Dr. Nutter's examination of Plaintiff's dorsolumbar spine showed some normal curvature. Her lumbar range of motion showed seventy (70) degrees flexion, thirty (30) degrees left side bend, and twenty (20) degrees right side bend. Plaintiff had back pain with range of motion testing. There

was no evidence of paravertebral muscle spasm of the lumbar spine. There was tenderness to palpation of the paraspinal muscles. Plaintiff's straight-leg raising test was normal in the sitting and supine position. She could stand on one leg with no difficulty. Dr. Nutter found no hip joint tenderness, redness, warmth, swelling, or crepitus. Her right and left hip ranges of motion was one-hundred (100) degrees flexion. Dr. Nutter's neurological examination of Plaintiff showed her cranial nerves were intact. She had normal sensations to touch, pin prick, and vibrations. Plaintiff's Romberg's sign was absent. Dr. Nutter had difficulty eliciting reflexes because of Plaintiff's "inability to relax." She had no clonus, no atrophy, and no pathological reflexes. Plaintiff could walk on her heels, she could toe walk, she could perform tandem gait without difficulty. Plaintiff could not squat due to back, knee, and thigh pain. Except for left toe extensor muscle strength being graded at 4/5, and Plaintiff's bilateral quadricep, hip extensor, hip flexor, foot dorsiflexor muscle being graded at 3/5, Plaintiff's muscle strength was 5/5. She had no give-away weakness (R. 265).

Dr. Nutter's impression was for arthralgia and chronic lumbar strain. He found Plaintiff had joint pain and tenderness but no synovial thickening, periarticular swelling, nodules, or contractures consistent with rheumatoid arthritis. Dr. Nutter noted that Plaintiff had range of motion abnormalities in her lumbar spine, but her straight-leg raising test was negative, she had no sensory abnormalities, and her reflexes were normal. Dr. Nutter noted that there was muscle weakness but those findings were not consistent with nerve root compression (R. 265).

Plaintiff's October 18, 2010, pneumotach calibration report showed she had normal spirometry; her lung age was sixty-three (63) (R. 267-69).

Dr. Mossallati completed an EMG nerve conduction study of Plaintiff's lower extremities on October 22, 2010. The test results were negative (R. 270, 274). There was "no electro

physiologic evidence of neuropathy, myopathy, or radiculopathy . . ." (R. 272). Dr. Mossallati noted Plaintiff had responded positively to Lyrica. He prescribed that medication to her. Plaintiff's mental status examination was normal; her motor strength was 5/5; her reflexes were symmetrical; her sensory was intact; her coordination was normal; her chest was clear (R. 270).

Dr. Parikshak completed a Physical Residual Functional Capacity Assessment of Plaintiff on November 8, 2010. Dr. Parikshak found Plaintiff could occasionally lift and carry up to fifty (50) pounds; frequently lift and carry up to twenty-five (25) pounds; stand and/or walk for a total of about six (6) hours in an eight (8) hour workday; sit for a total of about six (6) hours in an eight (8) hour workday; and push/pull unlimited (R. 276). Dr. Parikshak found Plaintiff could frequently climb ramps and stairs, balance, stoop, and kneel. Plaintiff could occasionally climb ladders, ropes, and scaffolds; crouch; and crawl (R. 277). Dr. Parikshak found Plaintiff had no manipulative, visual, or communicative limitations (R. 278-79). Dr. Parikshak found Plaintiff was unlimited in her exposure to extreme heat, wetness, humidity, and noise. Plaintiff should avoid concentrated exposure to extreme cold, vibration, fumes, odors, dusts, gases, poor ventilation, and hazards (R. 279).

Joseph Shaver, Ph.D., completed a Psychiatric Review Technique of Plaintiff on November 9, 2010 (R. 283). He found Plaintiff had an affective disorder; specifically, bipolar disorder (R. 286). Dr. Shaver found Plaintiff had anxiety-related disorder; specifically, recurrent, severe panic attacks manifested by a sudden, unpredictable onset of intense apprehension, fear, terror, and sense of impending doom occurring on the average of at least once a week (R. 288). Dr. Shaver found Plaintiff had mild limitations in her restrictions of activities of daily living and in maintaining social functioning. Dr. Shaver found Plaintiff had moderate limitations in maintaining concentration,

persistence, and pace. Dr. Shaver found Plaintiff had had no episodes of decompensation (R. 293).

Dr. Shaver completed a Mental Residual Functional Capacity Assessment of Plaintiff on November 9, 2010. As to Plaintiff's understanding and memory, he found Plaintiff was not significantly limited in her ability to remember locations and work-like procedures and ability to understand and remember very short and simple instructions. Plaintiff was moderately limited in her ability to understand and remember detailed instructions. As to Plaintiff's sustained concentration and persistence, Dr. Shaver found Plaintiff was not significantly limited in her ability to carry out very short and simple instructions, ability to perform activities within a schedule, ability to maintain regular attendance, ability to be punctual with customary tolerances, ability to sustain an ordinary routine without special supervision, ability to work in coordination with or proximity to others without being distracted by them, and ability to make simple work-related decisions (R. 297). Plaintiff was moderately limited in her ability to carry out detailed instructions, ability to maintain attention and concentration for extended periods, ability to complete a normal workday and work week without interruptions from psychologically based symptoms, and ability to perform at a constant pace without an unreasonable number and length of rest periods (R. 297-98). Dr. Shaver found Plaintiff was not significantly limited in any category of social interaction or any category of adaption (R. 298).

Plaintiff was examined by Dr. Watkins on November 22, 2010. She was "pleasant, jovial, talkative." It was noted that her arthritis was controlled when she took her medication. Plaintiff stated that she did "so much 'running' for family that she often" forgot to take the medication. Plaintiff reported a sharp pain in her right side; she stretched to relieve that pain. Plaintiff's ranges of motion were normal. Her sensation was intact (R. 311). She was diagnosed with neuropathy,

right side pain, and sinusitis. Dr. Watkins ordered a fasting glucose test because Plaintiff stated she was "worried" she may have diabetes (R. 312).

G. David Allen, Ph.D., reviewed the file on January 5, 2011, and affirmed Dr. Shaver's November 9, 2010, assessment.

Dr. Franyutti completed a Physical Residual Functional Capacity Assessment of Plaintiff on January 24, 2011 (R. 302). Dr. Franyutti found Plaintiff could occasionally lift and carry up to fifty (50) pounds; frequently lift and carry up to twenty-five (25) pounds; stand and/or walk for a total of about six (6) hours in an eight (8) hour workday; sit for a total of about six (6) hours in an eight (8) hour workday; and push/pull unlimited (R. 303). Dr. Franyutti found Plaintiff could frequently balance, stoop, kneel, and crouch; occasionally climb ramps and stairs and crawl; and never climb ladders, ropes, or scaffolds (R. 304). Dr. Franyutti found Plaintiff had no manipulative, visual, or communicative limitations (R. 305-06). Dr. Franyutti found Plaintiff was unlimited in her ability to be exposed to wetness, humidity, and noise. Plaintiff should avoid concentrated exposure to extreme cold and heat, vibration, fumes, odors, dusts, gases, poor ventilation, and hazards (R. 306).

On February 21, 2011, Plaintiff presented to Dr. Watkins with complaints of chronic knee pain, bilateral hand numbness, and dizziness. Plaintiff stated Lyrica helped ease her knee pain, but both knees ached constantly. Plaintiff was pursuing disability. Upon examination, Dr. Watkins found Plaintiff was alert, oriented, and in no distress. Dr. Watkins' examination of Plaintiff's head, ears, nose, throat, chest, heart, neck, abdomen, and extremities produced normal results. Dr. Watkins found Plaintiff had bilateral knee crepitation and tenderness. She had no ligamental instability, effusion, or erythema. Dr. Watkins continued Plaintiff's prescription for Celexa and noted she was "fairly stable on" that medication. Dr. Watkins requested an EMG be performed on Plaintiff's upper

extremities relative to her complaints of carpal tunnel syndrome. Dr. Watkins continued "current medication" for treatment of Plaintiff's osteoarthritis of her knees (R. 310).

Dr. Watkins completed a Physical Residual Functional Capacity Questionnaire of Plaintiff on February 21, 2011. Dr. Watkins listed "bilateral carpal tunnel symptoms & osteoarthritis b/l knees x 4-5 yrs" as the nature, frequency and length of her contact with Plaintiff. Dr. Watkins listed osteoarthritis in both knees, COPD, anxiety, and depression as her diagnoses. Dr. Watkins found Plaintiff's prognosis was "fair." Plaintiff's symptoms were constant pain in both knees, numbness and tingling in both hands, depression, and "claim[ed] she has dizziness + feels tired often." Dr. Watkins characterized Plaintiff's nature, location, frequency, precipitating factors, and severity of pain as "throb/ache b/l knees [with] occasional sharp pains. Constant - meds help but make her sleepy. Pain worsened by walking/standing. Pain is intense, per patient." Dr. Watkins noted increased "crepitus b/l knees [with] effusion," "slightly diminished grip strength b/l" and negative Tinel's sign and positive Phalen's sign as her clinical findings and objective signs of Plaintiff's conditions. Dr. Watkins noted Plaintiff was treated with Daypro and Lyrica, which helped alleviate Plaintiff's symptoms but made her sleepy. Dr. Watkins found Plaintiff's symptoms had lasted or would last for at least twelve (12) months (R. 323). Dr. Watkins found Plaintiff was not a malingerer, and her depression and anxiety affected Plaintiff's physical condition. Dr. Watkins found Plaintiff's impairments were "reasonably" consistent with her symptoms. Plaintiff would experience pain and other symptoms severe enough to interfere with her attention and concentration. Dr. Watkins found Plaintiff was capable of low-stress jobs. Dr. Watkins noted Plaintiff was "easily overwhelmed & stressed. When faced [with] stressful situations, [Plaintiff] often [became] panicked & more depressed & look[ed] for an out." Dr. Watkins found Plaintiff could walk for one-half (½)

block "at most" without needing to rest or experiencing severe pain. Plaintiff could stand and sit for twenty (20) minutes (R. 324). Plaintiff could sit and stand/walk for a total of about two (2) hours in an eight (8) hour workday. Plaintiff needed to walk every thirty (30) minutes for ten (10) minutes during an eight (8) hour workday. Plaintiff needed a job that allowed her to shift positions at will and to take unscheduled breaks every thirty (30) minutes for ten-to-fifteen (10-15) minutes. Plaintiff did not need to elevate her legs; she did not need an assistive device (R. 325). Dr. Watkins found Plaintiff could lift ten (10) pounds occasionally and less than then (10) pounds frequently. Dr. Watkins found Plaintiff had significant limitations in reaching, handling, and fingering. Plaintiff could grasp, turn, and/or twist objects ten (10) percent of the time during an eight (8) hour workday; could finger (fine manipulation) less than fifty (50) percent of the time during an eight (8) hour workday; and could reach, including overhead reaching, with her arms one-hundred (100) percent of the time during an eight (8) hour workday. Plaintiff could stoop fifty (50) percent of the time during an eight (8) hour workday; Plaintiff could not crouch. Plaintiff's impairments would produce "'good'" and "'bad'" days. Dr. Watkins found Plaintiff would be absent from work four (4) times per month due to her impairments (R. 326). Dr. Watkins noted Plaintiff had "depression + anxiety + would not do well in high-stress position or one that deals often [with] other people. She also has osteoarthritis + should avoid cold. [Plaintiff] also has COPD & should therefore [not] be around dust or chemicals or fumes" (R. 327).

Plaintiff was evaluated and began physical therapy for low back pain at Mountain State Physical Therapy on February 22, 2011 (R. 337-39). After her physical therapy, Plaintiff reported decreased back pain (R. 339). Plaintiff participated in Physical Therapy on February 23, 25, and 28, 2011; March 2, 4, and 7, 2011 (R. 340-45). Plaintiff did not attend her March 8 or 10, 2011, physical

13

therapy sessions (R. 346-47).

Dr. Salman noted Plaintiff had been admitted to UHC's behavioral medicine unit on March 8, 2011, for depression and suicidal ideation. She had been placed on safety precautions. The "[f]ocus of treatment was on improving her mood and coping skills and eliminating suicidal ideation with plan." She was discharged on March 14, 2011, was in stable condition, and had made "appropriate follow-up appointments" (R. 373).

On March 14, 2011, Plaintiff presented to Dr. Watkins for a "hospital follow up"; she had "just [been] discharged [that] morning from the behavioral health unit" at UHC. Plaintiff had thought of "driving her car off a cliff." She had no intention of acting on the thought. Plaintiff stated she had been under a "great deal of stress with her family and her husband's family" and had been more depressed. Plaintiff had been treated with Cymbalta while a patient at UHC and it had "been helping much better." Upon examination, Plaintiff was alert, oriented, and in no acute distress. Her head, ears, neck, throat, eyes, heart, lungs, abdomen, and extremities were all normal. Plaintiff made good eye contact. Her mood was stable. Her speech was non-pressured. She denied depression, suicidal ideations, or homicidal ideations. Plaintiff was instructed to continue medicating with Cymbalta and Celexa and follow up with her doctor at UHC. Plaintiff was to continue medicating her knee osteoarthritis with Daypro (R. 328, 349).

Denise Ammons, M.A., L.S.W., L.P.C., A.A.D.C., of USC, completed an initial assessment of Plaintiff on March 15, 2011. Plaintiff reported that she had been released from UHC's behavioral health unit on March 14, 2011, after having been "admitted for suicidal ideation and 'severe depression' a week earlier." Plaintiff stated she had reported to USC to "get her case reopened 'before [she] got too far down[,]' but upon seeing the intake worker[,] it was recommended that she

14

seek voluntary hospitalization due to the symptoms she was experiencing." Plaintiff reported she had not been taking her medication regularly and she had experienced both depression and anxiety symptoms, which included restlessness, tension, irritability, loss of interest in activities, increased sleep, social withdrawal, periods of self-neglect, and feelings of worthlessness, hopelessness, and helplessness. Plaintiff reported she had experienced depression since the 1994 death of her husband; she had not received outpatient therapy since 1998, when she lost her second husband. Plaintiff stated that being hospitalized was "helpful 'because it allowed [her] time to clear [her] mind.'" Plaintiff reported her mother had suffered from depression (R. 354). Plaintiff reported she did not have suicidal or homicidal ideations. She medicated with Celexa, Cymbalta, Nexium, Lyrica, Oxaproxin, vitamin B-12, vitamin D, and an Albuterol nebulizer. Plaintiff reported she graduated from high school and worked for several years in grocery or convenience stores. Plaintiff received Medicaid and had not worked since 2009. Ms. Ammons' examination of Plaintiff's mental status showed Plaintiff's mood was euthymic with restricted affect. All areas of her mental status appeared to be within normal limits. She was oriented, times four (4). She was casually dressed and groomed. Ms. Ammons noted Plaintiff would participate in intensive individual therapy and she "desire[d] no other services at this time" (R. 355).

On March 15, 2011, Ms. Ammons diagnosed Plaintiff with major depressive disorder, recurrent, moderate, "as evidenced by subjective report of 'feeling really down', (sic) anhedonia, increased self-neglect, increased sleep, suicidal ideation with plan, and feelings of worthlessness, hopelessness, and helplessness" (R. 357).

On April 6, 2011, Sandra Jones, Plaintiff's therapist, completed a Medical Source Statement (Mental) of Plaintiff. In the understanding and memory category, Ms. Jones found Plaintiff had mild

limitation in her ability to remember locations and work-like procedures; moderate limitations in her ability to understand and remember very short, simple instructions; and moderately severe limitations in her ability to understand and remember detailed instructions. In the category of sustained concentration and persistence, Ms. Jones found Plaintiff had no limitations in her ability to sustain ordinary routine without special supervision; had mild limitations in her abilities to carry out very short and simple instructions and make simple work-related decisions; had moderate limitations in her abilities to maintain attention and concentration for extended periods of time, perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, work in coordination with or proximity to others without being distracted by them, complete a normal workday and work week without interruptions from psychological based symptoms, and perform at a consistent pace without any unreasonable number and length of rest periods. She had moderately severe limitations in her ability to carry out detailed instructions (R. 329). As to Plaintiff's limitations in the social interaction category, Ms. Jones found Plaintiff had no limitations in her abilities to ask simple questions, request assistance, maintain socially appropriate behavior, and adhere to basic standards of neatness and cleanliness; had mild limitations in her ability to interact appropriately with the general public; and had moderate limitations in her abilities to accept instructions, respond appropriately to criticism from supervisors, and get along with coworkers or peers without distracting them or exhibiting behavioral extremes. In the adaption category, Ms. Jones found Plaintiff had mild limitations in her abilities to be aware of normal hazards and take appropriate precautions and travel in unfamiliar places or use public transportation; moderate limitations in her ability to set realistic goals or make plans independently of others; and moderately severe limitations in her ability to respond appropriately to changes in the work setting. Ms. Jones

diagnosed moderate depression; she noted Plaintiff had first received mental health treatment in 1998 after the death of her husband. Ms. Jones' clinical observation was as follows: "Oriented x 4. Good eye contact. Hospitalized March 2010 for suicidal ideations. None currently. Recent & remote memory deficits. No indicators of psychotic symptoms noted" (R. 330). Ms. Jones found Plaintiff's impairments lasted or would last for twelve (12) months; they did not exacerbate pain or physical symptoms (R. 331). Ms. Jones wrote the following medical/clinical findings to support her assessment: "[Plaintiff] began experiencing depression/anxiety after death of husband in 1998. Has days that she avoids people. Hospitalized for suicidal thoughts [March] 2010. Did take overdose of Tylenol at age 16 but no treatment. Physical problems & financial difficulties affect mood & anxiety level." Ms. Jones found Plaintiff would have "'good'" and "'bad'" days. Ms. Jones found Plaintiff would be absent four (4) times a month due to her impairments (R. 332).

Dr. Alghadban examined Plaintiff relative to numbness and tingling in her upper extremities on April 22, 2011. He noted the EMG nerve conduction study that he had conducted earlier of both the upper and lower extremities was negative. Plaintiff reported Lyrica was "helping somewhat." Plaintiff "showed no change from previous visits." Dr. Alghadban increased Plaintiff's dosage of Lyrica (R. 383).

Plaintiff presented to Dr. Watkins on June 13, 2011, with complaints of bilateral knee osteoarthritis and dizziness. Plaintiff reported her knee-related symptoms had been "doing pretty well on Daypro," but her knees were "worse now." Plaintiff requested assistance with obtaining an appointment with Dr. Courtney. Plaintiff reported constant ache and sharp pains in her knees. She felt as if her knees were weak and that she might fall; she had not fallen recently. Plaintiff stated prolonged standing and walking worsen her symptoms and cause her knees to swell. Plaintiff

reported she sometimes felt dizzy when bending over or sitting still. Plaintiff reported she was under a lot of stress but was "handling it better." She had no suicidal thoughts. Upon examination, Dr. Watkins found Plaintiff weighed one-hundred, eighty-six (186) pounds. Plaintiff was alert and oriented. She was in no acute distress. Dr. Watkins' examination of Plaintiff's head, ears, neck, throat, heart, lungs, and abdomen produced normal results. Plaintiff had no clubbing, cyanosis, or edema in her extremities; she had no ligamental instability; she had no meniscal signs; she had no joint effusion, erythema, or increased warmth. She had "some Chondromalacia of bilateral knees" and "[t]enderness along superior medial joint lines." Neurologically, Plaintiff's cranial nerves were grossly intact. Her deep tendon reflexes were graded at 2+, bilaterally. Her Romberg was negative. She could complete finger-to-nose testing with "ease." Plaintiff had normal muscle/skeletal strength, tone, and gait. Dr. Watkins instructed Plaintiff to continue medicating with Daypro. Dr. Watkins made a follow-up appointment on behalf of Plaintiff with Dr. Courtney. Plaintiff refused to undergo vestibular autorotation test for dizziness. Dr. Watkins ordered blood work to check Plaintiff's vitamin D and vitamin B-12 levels due to a deficiency; she continued supplements to treat those deficiencies. As to Plaintiff's COPD, Dr. Watkins noted Plaintiff continued to smoke even though she had "encouraged her to quit." Plaintiff treated her COPD with use of a Proventil inhaler; Dr. Watkins also prescribed Spiriva and Singular (R. 350, 363

On June 13, 2011, Dr. Watkins prescribed a cane to Plaintiff to aide in ambulation (R. 353).

Plaintiff reported daily dizziness to Dr. Watkins on August 2, 2011. Dr. Watkins referred her for a vestibular autorotation test. Plaintiff complained of right shoulder strain, which she had experienced for several months due to overuse. Plaintiff weighed one-hundred, eighty-three (183) pounds. Dr. Watkins' examinations of Plaintiff's head, eyes, ears, neck, throat, heart, lungs,

abdomen, and extremities were normal. Dr. Watkins found "some muscle tenderness over the cervical spine bilaterally, much worse on the right, as well as tenderness and muscle tension along the superior spine of the scapula and medial border." Plaintiff's muscle strength was 5/5. Her ranges of motion were within normal limits. Dr. Watkins noted Plaintiff had an appointment with Dr. Courtney in September, 2011, for bilateral knee osteoarthritis. Dr. Watkins instructed Plaintiff to continue medicating with Daypro. Dr. Watkins diagnosed muscle strain to the right shoulder and prescribed Flexeril and Voltaren. Plaintiff was instructed to return in six (6) months (R. 361).

Plaintiff's September 14, 2011, vestibular autorotation test was within normal limits and was "compatable (sic) with a peripheral vestibular syndrome." It was noted that, "if [Plaintiff's] neuro exam [was within normal limits], would recommend course of Antivert and or vestibular exercises. If no improvement[,] would proceed [with] CT or MRI of brain + possible neurological referral." Dr. Watkins referred Plaintiff to physical therapy for vestibular exercises (R. 364-65).

Dr. Alghadban conducted an EMG of Plaintiff's upper extremities on October 25, 2011. The needle examination of "selected bilateral upper extremity muscles was normal"; however Dr. Alghadban's conclusion was as follows: "This is an abnormal study. There is electrophysiological evidence of right median focal mono neuropathy at the wrist level consistent with right carpal tunnel syndrome mild in severity. There is no electro physiologic evidence of cervical radiculopathy on either side" (R. 385).

Administrative Hearing

Plaintiff testified she was four (4) feet, nine (9) inches tall and weighed one-hundred, eighty-five (185) pounds. Plaintiff lived with her husband and two (2) children, aged fourteen (14) and sixteen (16) (R. 43). Plaintiff stated she provided "whatever care [was] required for the children."

Plaintiff had a valid driver's license (R. 44). Plaintiff stated she had not smoked for more than one (1) year (R. 45). Plaintiff completed ninth grade. She did not obtain her GED. She had received cashier training. She was a certified manager for a food chain (R. 46). Plaintiff received food stamps but did not have a medical card (R. 47).

The ALJ noted that Mr. Levin had listed a diagnosis of bipolar disease and panic disorder in his consultative examination of Plaintiff; however, there was no such diagnosis by any treating physician (R. 60).

Plaintiff stated she had back and knee conditions (R. 60). Plaintiff's back was "not as bad" as her knees and hands. Plaintiff stated her back hurt and became numb when it was cold. She experienced back pain "most of the time" (R. 61). Plaintiff stated her knee pain was the same in each knee; they swelled. Both hands hurt and would swell. Her hand and knee swelling lasted for six (6) to eight (8) hours and it occurred twenty-eight (28) days per month (R. 62). Plaintiff testified she could not stoop, crouch, crawl, or bend. Plaintiff could stand for thirty (30) minutes "without [her knees] throbbing." Plaintiff could walk eleven (11) feet. Plaintiff could sit for thirty (30) minutes before her knees "start[ed] hurting." Plaintiff was "lucky" to carry a gallon of milk with both hands. She used a computer (R. 63). She emailed her sister once every two (2) or three (3) weeks. Plaintiff testified she had a "little bit" of COPD, which was "more allergies" and "more asthma" than COPD. Strong perfumes and "heavy chemicals . . . set[] [her] asthma off . . . ." Plaintiff treated this condition with an inhaler. Plaintiff continued to have "problems" with dizziness. Plaintiff testified that her doctor thought the dizziness was caused by her knees being "off balance," which was "throwing [her] to be dizzy" (R. 64). Plaintiff stated the doctor had "ruled out" peripheral vestibular syndrome as the cause for her dizziness. Plaintiff experienced dizziness daily.

Plaintiff testified that her mental disorders caused her to not want to "get up and do anything." She would "rather just be left alone." She experienced these symptoms "three-quarters of the month" (R. 65). Her primary care physician treated her for a mental health disorder and prescribed Cymbalta (R. 65-66). She could not "afford the gas" to go to the Summit Center for treatment by a mental health specialist. She had not been treated there since March or April of "last year." Plaintiff stated her condition had not changed since she stopped being treated at the Summit Center (R. 66).

Plaintiff stated her medication made her sleepy. Plaintiff testified she did not read "much anymore." She did not "play on [her] computer as much as" she once did. She did not cook or do housework (R. 67). Plaintiff did not do the laundry or wash dishes. She grocery shopped with her husband. She was able to care for her personal needs. Plaintiff stated she "struggle[d]" getting into or out of a car. Getting into and out of the shower, walking up steps, and walking down steps were a "chore" for Plaintiff (R. 68). Plaintiff used a cane, which had been prescribed for her by Dr. Watkins the previous year.

Upon questioning by her lawyer, Plaintiff testified that her depression began in 1998 (R. 68). Plaintiff's husband testified Plaintiff played games on her computer. He and the children did the housework, cut the grass, took out the garbage, and did "odds and ends"; Plaintiff did "nothing" (R. 69). Plaintiff's husband had to help Plaintiff get out of bed at times. She had been hospitalized for depression. Plaintiff went to sleep to "relieve some of the stress" and alleviate knee pain (R. 70).

The ALJ asked the VE the following hypothetical question:

> . . . [W]ould you assume a hypothetical individual the same age, education and work experience as the claimant who retains the capacity to perform medium work with the following limitations. No more than frequent balancing, stooping, kneeling, crouching, no more than occasional crawling and climbing of ramps and stairs. No climbing of ladders, ropes or scaffolds, no more than frequent right side handling, the

work should avoid concentrated exposure to extreme hot and cold temperatures, vibrations, irritants such as fumes, odors, dust, gases and poorly ventilated areas and hazards including dangerous machinery and unprotected heights. The work should require no high level of concentration or any strict production quotas and there should be no more than occasional interaction with the public, supervisor and coworkers. Could this hypothetical individual perform any of the past work of the claimant as actually performed or as customarily performed per the <u>DOT</u>? (R. 76).

The VE stated such a hypothetical individual would not be able to do such past work and there would be no jobs in the national or regional economies that such a person could perform (R. 76-77). The VE stated that, at the medium level, "the work generally done at that level would require . . . continual use of the right hand in performing most jobs" (R. 78).

The ALJ then asked the VE the following:

Would you assume the same hypothetical individual but who retains the capacity to perform light work. Now all of the previous non-exertional limitations carry over unless otherwise indicated. I'm going to indicate the otherwise indicted. All postural movements are limited to occasional, that's balancing, stooping, crouching, climbing of ramps and stairs, no kneeling or crawling and the work should accommodate use of a cane for ambulation. All other non-exertional limitations from the previous hypothetical carry over. Are there jobs in the regional or national economy that this hypothetical individual could perform?" (R. 78).

The VE stated 60,500 national and 30 local sewing machine operator jobs and 39,800 national and 50 local electronic accessory assembler jobs would be available (R. 78).

<u>Evidence Provided to the Appeals Council</u>

On March 5, 2012, John R. Atkinson, Jr., M.A., a licensed psychologist, completed a psychological evaluation of Plaintiff, who was "referred by her attorney for an evaluation of current mental status in order to help determine her eligibility for Social Security Disability benefits." Plaintiff's attitude was pressured and intense. She spoke rapidly and "somewhat formal[ly]." Her cooperation was adequate, posture was normal, and gait was normal. Plaintiff reported her chief

complaints were degenerative disc disorder, osteoarthritis in both knees, bilateral carpal tunnel syndrome, dizzy spells, COPD, depression, anxiety, and mood swings (R. 392). Plaintiff stated her COPD onset date was 2002, and the onset date for carpal tunnel syndrome and "of functional limitations in activities of daily living" was 2006. Plaintiff listed the following symptoms: "'stooped, up off the floor, bending over, standing up - get dizzy fall over – hands, can't handle a gallon of milk, small things I drop them.'" Mr. Atkinson noted Plaintiff's sleep patterns were "marked by sporadic initial insomnia with intermediate and terminal awakening and hypersomnia, about once a month where she will sleep about 18 hours." She had "nightmares and bad dreams about her childhood." Plaintiff reported her eating patterns were poor, and she gained weight. Plaintiff had low energy and "draining fatigue about half of the month." Plaintiff stated she had a history of depression, which began "at age 9, 'molested,'" and had been depressed "on a constant basis, maintain[ed] she has been depressed every single day since she was 9 years old and describes the feeling as 'don't really – nobody wants me, by myself, nobody talks to me, sad, moody.'" Plaintiff stated she had experienced "periods of elevated activity, which began in her teens." She was "'up – hyper, want to clan, do things, spend more money, be sociable – depression, let[] up a little but still down.'" This occurred about twice monthly and did not, according to Mr. Atkinson, "meet any duration criteria for either mania or hypomania." He further noted Plaintiff could "[]not legitimately be diagnosed as suffering from bi-polar disorder either now or in the past, but in fact was diagnosed as bi-polar on her CE examination without any basis." Mr. Atchinson found Plaintiff's condition "really sounds more like agitated depression" because she became agitated, restless, wired up, "climb[ed] the walls, [could not] sit still," felt hyper, was stressed out and did "all these activities in order to ward off 'nervous energy'" (R. 393).

23

Mr. Atkinson found that Plaintiff's complaints about anxiety did not "describe the usual symptoms as given in the DSM-IV." Plaintiff stated her anxiety-related symptom was "'just tired.'" Plaintiff stated she had a fear of dying, fear of abandonment, fear of not being wanted or being "'tossed out,'" which were symptoms "actually associated with her borderline personality disorder." Mr. Atkinson found Plaintiff did not meet the criteria for anxiety disorder and showed no signs of anxiety during the evaluation (R. 393).

Plaintiff reported she had had "anger problems" for years. She was impatient, was irritable, and had "smoldering underlying resentment stemming from childhood abuse and neglect." Plaintiff stated she had a "'slow build-up, then a volcano.'" Mr. Atkinson found these were symptoms "typical of borderline personality" disorder (R. 393).

Plaintiff reported obsessive thoughts of suicide. She stated she started "feeling like killing herself as a teenager, overdosed, didn't go to the hospital or doctor and stated[d] she has had those feelings over the years and continue[d] to have them." She had no "firm" suicidal plan. Mr. Atkinson found this symptom "typical of borderline personality" disorder (R. 394).

Plaintiff reported she had degenerative disc disease and deterioration at L4-L5, bilateral carpal tunnel syndrome, dizzy spells, and COPD. Plaintiff stated she was diagnosed with fibromyalgia in 2007. Mr. Atkinson noted Plaintiff met "the criteria for a triad of depression, chronic fatigue and disseminated muscle pain, but [did] not have the perfectionistic type personality that usually [got] along with the disorder" (R. 394).

Plaintiff reported she had been hospitalized at UHC in March 2010, for suicidal ideations and had "followed up" at the Summit Center. She was "'going back'" there "'this Thursday.'" Plaintiff denied alcohol or drug use. Mr. Atkins noted the following: "When asked about alcohol, she state[d]

'never, I have drunk.' As [could] be seen she [was] a little bit evasive or gloss[ed] over alcohol, state[d] she drank about age 12 and when asked about drinking more she state[d] 'never' and state[d] 'the only time I was drunk was when I was 28.' She state[d] she ha[d] not used alcohol since then and denie[d] any alcohol related complications" (R. 395).

Plaintiff stated she was the oldest of three (3) children. She had one (1) half-sibling. Her parents divorced when she was three (3) years old. She lived with her mother, who remarried when Plaintiff was ten (10) years old. She had "three various stepfathers," who were described as follows: "'the first one was a drunk, the second and third [were] . . . very mean'" (R. 396). Plaintiff reported she was not physically mistreated as a child; however, she felt emotionally neglected by her mother and uncared for and abandoned by her father. Plaintiff stated, at age nine (9), she had been "sexually molested . . . by an older uncle," which she described as "'feeling - touching'" and lasting for one (1) year. Then Plaintiff was sexually molested "the next year" by her grandfather, which she described as lasting for seven (7) months and included "'touching - feeling, tried to - penetration' but did make the patient perform oral sex on him." Plaintiff stated she experienced sexual dysfunction, which included promiscuity when younger and "avoidance" when older. Plaintiff never ran away from home. Plaintiff had been married (4) times and had two (2) children, aged fourteen (14) and sixteen (16), who lived with Plaintiff and who were "'learning disabled.'" Plaintiff reported her current husband as "'pretty happy.'" Her husband was disabled and collected Social Security insurance. Plaintiff stated her marriage was "'kind of rocky,'" and her husband felt "rejected because of her current sexual avoidance" (R. 397).

Upon mental examination, Mr. Atkinson found Plaintiff was "superficially open, frank and candid" and "somewhat watchful and shrewd beneath the surface." Her social rapport was "easy."

Her speech patterns were "relevant, coherent, appropriate to conversation, of good quality and precise." Plaintiff was oriented as to person, time, and place. Her mood was neutral; her affect was flat and diminished. Her thought process was relevant; her stream of thought was normal. Plaintiff's thought content was described as she "felt there were hidden meanings behind what people say or do[.] [S]he had developed paranoid attitudes of distrust[.] [She felt] . . . that people are watching her[] [and were] out to get her – this include[d] relatives and family, 'the way they are,' and this appear[ed] to be somewhat lifestyle related." Plaintiff had no hallucinations or illusions (R. 398). Plaintiff's insight was "fairly good." Her judgment was normal; her immediate memory was normal; her delayed memory was "moderately impaired"; her remote memory was "broadly intact." Plaintiff's concentration was "markedly impaired." This finding was based on her "Arithmetic Raw Score of 7, Scale Score of 4 and Standard Score of 65." Plaintiff's attention was normal; her abstract reasoning was normal; her psychomotor behavior was normal; her persistence was average; her pace was average; and her social functioning was within normal limits (R. 399).

As to her social functioning, Plaintiff reported she did not attend church, had no friends, visited relatives once a week, no relatives visited her, and she did not go to dinner or the movies. Mr. Atkinson noted Plaintiff's "[i]nterpersonal relationships tend[ed] to be somewhat shallow, ambivalent and have an unstable borderline quality." When Mr. Atkinson asked Plaintiff to draw a person, Plaintiff "drew her figure in the upper central part of the page." The figure was "ambivalent as to sex" with a body and the arms of a male and feminine face, figure, and hair. The left arm was "marked by workovers and the body was offset a little bit from the shoulders." The distortions "suggest some somatization" (R. 399). Mr. Atkinson noted Plaintiff "projected on to her figures (sic) face a kind of smug, smirky, self-satisfying shifty quality, with hollow empty blanks for

26

eyes and again one [got] the feeling of a shrewd individual, but the [Plaintiff] may [have tried] to hide that beneath a facade of sincerity. It [was] noted that we [could] look for some underlying sociopathic trends in this individual, covered by a borderline personality adjustment" (R. 400).

Mr. Atkinson summarized his findings as follows: Plaintiff had a mixed personality disorder, which had "all of the symptoms of borderline personality present, but with a sort of underlying sociopathic shifty quality." Plaintiff had lived by "her wits." Plaintiff's complaints were of "chronic mood problems, a pain disorder with chronic pain symptoms and a kind of underlying, brooding, morose resentment." Plaintiff's previous psychological evaluation "grossly misdiagnosed her conditions." She had never met any criteria for bipolar disorder and had "mood shifts which [were] characteristic of borderline personality disorder." Plaintiff was somatically focused, "claiming things like fibromyalgia and conditions which appear[ed] to be in excess of observed physical findings." Plaintiff had "lived a life of stable instability, vocationally, personally, geographically and otherwise and this continue[d] to the present time." Mr. Atkinson diagnosed the following: Axis I - mood disorder, NOS, "mood instability associated with borderline personality to include depression, agitation and chronic anger state disorder," and pain disorder with both psychological factors and general medical condition with somatic complaints; Axis II - borderline personality disorder (sociopathic type); Axis III - no diagnosis; Axis IV - health issues, financial problems, relational problems; and Axis V - GAF of fifty (50) (R. 400).

Mr. Atkinson noted his rationale for his diagnosis of Plaintiff's mood disorder was her "long history of mood changes of short duration, not meeting the criteria for mania or hypomania," chronic anger state disorder with outbursts, constant depression, and not having a diagnosis of bipolar disorder (R. 400). His rationale for his diagnosis of pain disorder was Plaintiff's pain complaints

27

in excess of medical findings and complaints of physical pain that precluded her from working. Mr. Atkinson's rationale for his finding of borderline personality disorder was Plaintiff's "abandonment issues, geographical drifting, four marriages, mood instability, length of depression and agitation," "certain underlying shrewd, shifty quality with superficial and detached relationships," and "living by her wits most of her life." Mr. Atkinson noted that Plaintiff's "florid personality disorder symptoms have been totally unnoticed by any of her treating individuals" because they could not "see beyond the superficial manifest symptoms." Mr. Atkinson found Plaintiff's prognosis was "fair" and she would be able to manage her financial affairs (R. 401.)

Attached to Mr. Atkinson's evaluation report was a handwritten document by Plaintiff. Plaintiff wrote that she did not report that she had been molested as a child because she felt ashamed. She attempted suicide when she was fourteen (14) or fifteen (15) years old by ingesting Tylenol. Plaintiff married when she was sixteen (16), was married to that husband for twelve (12) years, and was widowed upon his death in 1994. Her second husband, with whom she had two (2) children, was killed in a car accident in 1998. She sought mental health care at the Summit Center after the death of her second husband (R. 403). Plaintiff wrote that her uncle molested her when she was nine (9) years old. The same uncle molested her sister. She was then molested by her maternal grandfather (R. 404). Plaintiff experienced nightmares. She did not want to be "touched by any man at all" (R. 405). On March 6, 2012, Mr. Atkinson completed a Medical Source Statement (Mental) on Plaintiff. In the understanding and memory category, Mr. Atkinson found Plaintiff had no limitation in her ability to remember locations and work-like procedures or ability to understand and remember very short, simple instructions and had moderate limitations in her ability to understand and remember detailed instructions. In the sustained concentration and persistence category, Mr.

Atkinson found Plaintiff had no limitations in her ability to carry out very short and simple instructions, ability to sustain ordinary routine without special supervision, and ability to make simple, work-related decisions; had mild limitations in her ability to maintain attention and concentration for extended periods of time, ability to perform activities within a schedule, ability to maintain regular attendance, and ability to be punctual within customary tolerances; and moderate limitations in her ability to carry out detailed instructions, ability to work in coordination with or proximity to others without being distracted by them, ability to complete a normal workday and work week without interruptions from psychological based symptoms, and ability to perform at a consistent pace without any unreasonable number and length of rest periods (R. 387). In the social interaction category, Mr. Atkinson found Plaintiff was not limited in her ability to ask simple questions or request assistance; had mild limitations in her ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and had moderate limitations in her ability to interact appropriately with the general public, ability to accept instructions and respond appropriately to criticism from supervisors, and ability to maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness. In the adaptation category, Mr. Atkinson found Plaintiff had no limitations in her ability to be aware of normal hazards and take appropriate precautions, ability to travel in unfamiliar places or use public transportation, and ability to set goals or make plans independently of others and had mild limitations in her ability to respond appropriately to changes in the work setting (R. 388). Mr. Atkinson found Plaintiff's onset of her mental impairments was "childhood." Mr. Atkinson found Plaintiff had "pain complaints in excess of physical findings (fibromyalgia) + other pain . . . in excess of findings." Mr. Atkinson found Plaintiff's impairment had lasted or were expected to last for twelve (12) months (R. 389).

Plaintiff's impairments would cause "'good'" days and "'bad'" days. Plaintiff would be absent from work for more than four (4) times per month due to her impairments (R. 390).

Evidence Submitted to the Court

Plaintiff attached an April 27, 2012 "follow up note" from Dr. Alghadban; April 27, 2012, EMG; May 1, 2012 lumbar spine MRI; a May 17, 2012,Physical Functional Capacity Questionnaire completed by Dr. Kulkarni; and an order, from Dr. Underwood, for physical therapy to her Memorandum in Support of Motion for Summary Judgment (Docket Entry 13-2, pp. 2-11). Also attached was an "Electronic Records Express" receipt and tracking ticket that read that the above documents were submitted to the Appeals Council on May 30, 2012 (Docket Entry 13-2, p. 1). The Appeals Council looked at this evidence but did not include it as part of the record. (R. at 2, 5.) Instead, it noted that this evidence did "not affect the decision about whether [Plaintiff was] disabled on or before February 6, 2012." (R. at 2.)

On April 27, 2012, Dr. Alghadban wrote that Plaintiff medicated with Lyrica three (3) times a day. Plaintiff complained of weakness, numbness and tingling in both upper extremities. She dropped things. Dr. Alghadban noted he had conducted an EMG and nerve conduction study in "October," which showed mild carpal tunnel syndrome and nothing else. Dr. Alghadban also noted that he repeated the EMG and nerve conduction study for Plaintiff's lower extremities because of numbness and tingling, which was "suggestive of carpal tunnel syndrome, but not severe enough to do surgery." Plaintiff was instructed to wear wrist splints. Upon examination, Dr. Alghadban found Plaintiff had a normal mental status; her cranial nerves were normal; her motor strength was 5/5; her chest was clear; her coordination was normal; reflexes were absent in her ankles; and her sensory exam showed "decreased pinprick and touch in a stocking distribution." Dr. Alghadban continued

Plaintiff's prescription for Lyrica and instructed her to wear wrist splints. Dr. Alghadban noted that if Plaintiff's symptoms became worse, he "might consider more aggressive treatment" (Docket Entry 13-2, p. 2).

Dr. Alghadban found Plaintiff's April 27, 2012, nerve conduction study and EMG showed normal bilateral upper extremity muscles, normal bilateral ulnar motor and sensory responses, prolonged latency of the bilateral median mixed palm wrist responses, and normal bilateral median motor responses. Dr. Alghadban noted it was "an abnormal study. There [was] electrophysiological evidence of bilateral medial focal mono neuropathy at the wrist level consistent with bilateral carpal tunnel syndrome mild in severity" (Docket Entry 13-2, pp. 3-4).

A May 1, 2012 lumbar spine MRI showed "posterior disc bulge with left foraminal disc extrusion causing mild spinal stenosis and narrowing of both lateral recesses" and "moderate left foraminal stenosis with existing nerve root impingement." The impression was for "disc herniation with extrusion on the left side at L4-L5" and "exiting nerve root impingement upon the left L4 nerve root." A handwritten note read there was "disc (cushion between bones) on low back [was] bulging & putting pressure on a nerve that goes to the legs (sciatic nerve)" (Docket Entry 13-2, p. 5).

On May 17, 2012, Dr. Kulkarni, a non-treating physician, completed a Physical Residual Functional Capacity Questionnaire of Plaintiff. Dr. Kulkarni noted Plaintiff's diagnoses were for osteoarthritis of both knees, bilateral carpal tunnel syndrome, lumbar spine degenerative disc disease, COPD, anxiety, and depression. Dr. Kulkarni found Plaintiff's prognosis to be "fair to poor." Dr. Kulkarni listed the following as Plaintiff's symptoms: "[c]onstant right and left knee pains, with occasional swelling, knees giving out, [d]izziness 7 tiredness, [c]onstant low back pain. Decreased endurance. Panic attacks. Shortness of breath with cough and wheezing. Numbness/tingling in both

hands. [Fell] because of knee pain." Dr. Kulkarni characterized Plaintiff's pain as her low back pain graded as "7/10 (10 being worse). They are localized, aching/stabbing. They [got] worse with sitting and standing." Dr. Kulkarni listed the following clinical findings and object signs to support his findings: "Swelling/tenderness over both knees. Restricted range of motion and arthritis in both knees. Restricted range of motion of lumbar spine. Deceased lower extremity reflexes. EMG/NCS showed right hand carpal tunnel syndrome. Decreased grip strength and positive Phalen's test at both wrists." Dr. Kulkarni listed the following treatment and responses thereto: Lyrica caused sleep, Proventil caused shaking of hands. Oxycotin and Citalopram caused sleepiness and she was unable to drive after taking these 2 medications. Flexeril caused drowsiness. Dr. Kulkarni found Plaintiff's impairments had or would last for twelve (12) months (Docket Entry 13-2, p. 6). Dr. Kulkarni found Plaintiff was not a malinger. Depression and anxiety affected Plaintiff's physical conditions. Dr. Kulkarni found Plaintiff's impairments were consistent with her symptoms. Plaintiff would experience pain or other symptoms that would frequently interfere with her attention and concentration. Dr. Kulkarni found Plaintiff was capable of low stress jobs due to her history of anxiety and depression. Dr. Kulkarni found Plaintiff could walk for one-half (½) city block before she needed to rest. Plaintiff could sit and stand for twenty (20) or thirty (30) minutes at a time (Docket Entry 13-2, p. 7). Plaintiff could sit, stand, and walk for a total of about two (2) hours in an eight (8) hour workday. Dr. Kulkarni found Plaintiff would have to walk for five (5) minutes every thirty (30) minutes. Plaintiff would require employment that allowed her to shift positions from sitting, standing, and walking at will. She would need to take unscheduled breaks. Dr. Kulkarni noted the frequency of this need was "unknown"; the break would last for "about 5 minutes." Plaintiff did not need to elevate her legs; she did not need a cane to ambulate (Docket

Entry 13-2, p. 8). Dr. Kulkarni found Plaintiff could frequently lift less than ten (10) pounds and occasionally lift ten (10) pounds. As to reaching, handling, and fingering, Dr. Kulkarni found Plaintiff could use her right and left hands for ten (10) percent of an eight (8) hour competitive job to grasp, turn, and twist objects. Plaintiff could use her fingers for fine manipulation ten (10) percent of an eight (8) hour competitive job. Plaintiff could use her arms for one-hundred (100) percent of an eight (8) hour competitive job. Dr. Kulkarni found Plaintiff could bend and stoop for ten (10) percent of the time in an eight (8) hour workday. Plaintiff's impairments would produce "'good'" and "'bad'" days. Plaintiff would be absent from work more than four (4) times per month (Docket Entry 13-2, p. 9). Dr. Kulkarni found Plaintiff should avoid heights, moving machinery, vibrations, solvents/cleaners, dust, fumes, odors, smoke, chemicals, wetness, dryness, temperature extremes, high humidity, and cigarette smoke (Docket Entry 13-2, p. 10).

On May 30, 2012, Dr. Underwood referred Plaintiff for physical therapy for a herniated lumbar disc. Her physical therapy was to last for four-to-six (4-6) weeks for two-to-three (2-3) days per week (Docket Entry 13-2, p. 11).

## III. ADMINISTRATIVE LAW JUDGE DECISION

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. § 404.1520 (2000), ALJ Swayze made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through September 30, 2014.

2. The claimant has not engaged in substantial gainful activity since September 7, 2009, the alleged onset date (20 CFR 404.1571 *et seq.*).

3. The claimant has the following severe impairments: degenerative disc disease; mild degenerative joint disease of the knees; arthritis; mild, right carpal tunnel syndrome; obesity; bipolar disorder; and panic disorder without

agoraphobia (20 CFR 404.1520(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except that she can perform no tasks requiring high levels of concentration or strict production quotas, and should only have occasional interaction with the public, supervisor, and co-workers. The claimant requires use of a cane as needed for ambulation, and must also work in a controlled environment free of concentrated exposure to extreme hot and cold temperatures, vibrations, irritants (such as fumes, odors, dust, gases and poorly ventilated areas[,] and hazards (including dangerous machinery and unprotected heights). The claimant can perform frequent right side handling, occasional balancing, stooping, crouching, climbing of ramps/stairs, and no kneeling, crawling, or climbing of ladders, ropes, or scaffolds.

6.  The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.  The claimant was born on November 9, 1965, and was 43 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563).

8.  The claimant has a limited education and is able to communicate in English (20 CFR 404.1564).

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from September 7, 2009, through the date of this decision (20 CFR 404.1520(g)) (R. 15-31).

# IV.  DISCUSSION

## A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).  The Fourth Circuit held, "Our scope of review is specific and narrow.  We do not conduct a de novo review of the evidence, and the Secretary's finding of non-disability is to be upheld, even if the court disagrees, so long as it is supported by substantial evidence." Smith v. Schweiker, 795 F.2d 343, 345 (4th Cir.1986). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).  Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance.  If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'" Hays, 907 F.2d at 1456 (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968)).  In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

## B.  Contentions of the Parties

Plaintiff contends:

1.      The ALJ's residual functional capacity assessment is not supported by substantial evidence.

2.      The matter should be remanded for the ALJ to reconsider Plaintiff's limitations in light of new MRI evidence showing nerve impingement.

3.      The testimony of the VE is not substantial evidence to support the Commissioner's burden of proof because the VE was not informed of all of Plaintiff's limitations.

The Commissioner contends:

1.      Substantial evidence supports the ALJ's mental RFC finding.

2.      The new evidence Plaintiff submitted was not material.

3.      The VE was aware of Plaintiff's limitations.

In her reply brief, Plaintiff again contends that her case should be remanded for consideration of her May 1, 2012 MRI report and a redetermination of her credibility in light of this evidence.

## C.  RFC

As her first claim for relief, Plaintiff argues that the ALJ's mental RFC assessment is not supported by substantial evidence.  (Plaintiff's Brief at 9.)  Specifically, Plaintiff alleges that the ALJ erred by improperly relying on his own lay opinion regarding the validity of the psychological testing performed by Martin Levin.  (Id. at 10-11.)  She further asserts that additional evidence supports Mr. Levin's opinion that her concentration was severely deficient.  (Id. at 11.)  Defendant asserts that substantial evidence supports the ALJ's mental RFC finding.  (Defendant's Brief at 10-12.)

Under the Social Security Act, a claimant's RFC represents the most a claimant can do in a work setting despite the claimant's physical and mental limitations.  20 C.F.R. §§ 404.1545(a)(1); 416.945(a)(1) (2011).  "RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis;" that is, for "8 hours a day, for 5 days a week, or an equivalent work schedule."  SSR 96-8p, 1996 WL 374184, at *1 (July 2, 21996).  The Administration is required to assess a claimant's RFC based on "all the

relevant evidence" in the case record." 20 C.F.R. §§ 404.1545(a)(1); 416.945(a)(1). This assessment only includes the "functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments, including the impact of any related symptoms." SSR 96-8p, at *1. Even though the Administration is responsible for assessing RFC, the claimant has the burden of proving her RFC. See Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1993) (per curiam) (citing Grant v. Schweiker, 699 F.2d 189, 191 (4th Cir. 1983)) (claimant has the burden of production and proof through the fourth step of the sequential analysis); see also 20 C.F.R. §§ 404.1545(a)(3); 416.945(a)(3) (claimant is responsible for providing evidence to be used to develop RFC).

Regarding Mr. Levin's opinion, the ALJ wrote:

Consultative psychological evaluation was performed on October 12, 2010, by Martin Levin, M.A. The claimant drove to the evaluation accompanied by her husband. The claimant's posture and gait were within normal limits and there were no unusual voluntary movements noted. The claimant did not appear to need assistance in moving about. The claimant reported that she typically arises at 5:00 a.m. and does things such as brushing her hair, washing her face and then making iced tea. She does some housework in "chunks." She cooks family meals and helps her boyfriend (husband) with his appointments. The claimant stated that she spends a lot of time reading. She takes the children to their activities and recently went to church a few times. The claimant reported that she is able to take care of her own personal grooming. When she is feeling depressed, she may go a couple of days without doing so. The claimant indicated crying spells two or three times per week and also indicated suicidal thoughts and reported an overdose attempt after her second husband died. The claimant reported that she has full panics that include hyperventilation, tachycardia, high blood pressure and feeling as if she is having a heart attack. Mr. Levin opined that the claimant had severely deficient concentration because she could only do serial sevens to 93 (a very subjective test at best). Other than that, remote memory was opined to be moderately deficient, and immediate memory, recent memory, persistence and pace were within normal limits. Mr. Levin opined a diagnosis of bipolar disorder, most recent episode depressed, moderate; panic disorder without agoraphobia; asthma, chronic obstructive pulmonary disease; carpal tunnel; and arthritis, as reported by the claimant. Dr. Levin opined that the claimant's prognosis was guarded, but did not elaborate on the statement (Exhibit

2F).

(R. at 24.)

Given this, Plaintiff is correct in noting that the ALJ's lay opinion that the "serial sevens" test is "a very subjective test at best" is unsupported by testimony or other evidence in the record. However, "[t]he court will not reverse an ALJ's decision for harmless error, which exists when it is clear from the record that the ALJ's error was inconsequential to the ultimate nondisability determination." Tommasetti v. Astrue, 533 F.3d 1035, 1038 (9th Cir. 2008); see also Keys v. Barnhart, 347 F.3d 990, 994-95 (7th Cir. 2003) ("The doctrine of harmless error . . . is fully applicable to judicial review of administrative decisions."); Hurtado v. Astrue, C/A No. 1:09-1073-MBS-SVH, 2010 WL 3258272, at *11 (D.S.C. July 26, 2010) ("[T]he court acknowledges there may be situations in which an error in an opinion is harmless because it would not change the outcome of the ALJ's decision."). As discussed below, the undersigned finds that the ALJ's inclusion of his unsupported lay opinion was harmless, as it did not change the outcome of his decision.

The ALJ assigned "partial weight" to Mr. Levin's opinion, noting that the "conclusion that the claimant's concentration is severely deficient is inconsistent with the examination findings within the report as well as with the medical evidence of record as a whole." (R. at 29.) The undersigned finds that Mr. Levin's opinion is inconsistent with those given by the state agency reviewing physicians. 20 C.F.R. § 1527(f)(2)(I) provides:

> Administrative law judges are not bound by any findings made by State agency medical or psychological consultants, or other program physicians or psychologists. However, State agency medical or psychological consultants, or other program physicians or psychologists, are highly qualified physicians and psychologists who are also experts in Social Security disability evaluations. Therefore, administrative law judges must consider findings of State agency medical or psychological consultants, or other program physicians or psychologists, as opinion evidence except

for the ultimate determination about whether you are disabled.

On November 9, 2010, Dr. Shaver completed both a Psychiatric Review Technique and Mental Residual Functional Capacity Assessment of Plaintiff. He noted that Plaintiff was moderately limited in her ability to sustain concentration, persistence, or pace. (R. at 293.) As to Plaintiff's sustained concentration and persistence, he found that she was moderately limited in her ability to carry out detailed instructions, her ability to maintain attention and concentration for extended periods, and her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (R. at 297-98.) Plaintiff was not significantly limited in her ability to carry out very short and simple instructions; ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; ability to sustain an ordinary routine without special supervision; ability to work in coordination with or proximity to others without being distracted by them; and her ability to make simple work-related decisions. (R. at 297.) Overall, Dr. Shaver concluded that Plaintiff "retains the mental capacity to operate in work-like situations that do not require high levels of concentration or strict production quotas." (R. at 299.) G. David Allen, Ph.D., agreed with Dr. Shaver's assessment on January 5, 2011. (R. at 301.)

Mr. Levin's opinion is also inconsistent with other medical evidence contained in the record. On March 15, 2011, Plaintiff saw Denise Ammons, M.A., L.S.W., L.P.C., A.A.D.C. at United Summit Center, for an initial assessment. (R. at 354.) After this assessment, Ms. Ammons noted that all areas of Plaintiff's mental status were within normal limits. (R. at 355.) She did not indicate that Plaintiff had any issues with concentration.

On April 6, 2011, Sandra Jones, Plaintiff's therapist, completed a Medical Source Statement

(Mental) for Plaintiff. Ms. Jones found that Plaintiff had moderately severe limitations in her ability to carry out detailed instructions. (R. at 329.) She was moderately limited in her ability to maintain concentration and attention for extended periods of time; perform activities within a schedule, maintain regular attendance, and/or be punctual within customary tolerances; work in coordination with or proximity to others without being distracted by them; and complete a normal workday and workweek without interruptions from psychological based symptoms and to perform at a consistent pace without any unreasonable number and length of rest periods. (Id.) She was mildly limited in her ability to carry out very short and simple instructions and make simple work-related decisions. (Id.) Plaintiff had no limitations in her ability to sustain ordinary routine and persistence. (Id.)

Plaintiff asserts that Mr. Levin's opinion is bolstered by that of John Atkinson, M.A., whose assessment of Plaintiff was included in the record by the Appeals Council. (Plaintiff's Brief at 11.) However, the undersigned finds that Mr. Atkinson's opinion is internally inconsistent. Mr. Atkinson completed a Medical Source Statement (Mental) of Plaintiff. In this, he determined that Plaintiff was moderately limited in her ability to carry out detailed instructions, work in coordination with or proximity to others without being distracted by them, and complete a normal workday and workweek without interruptions from psychological based symptoms and to perform at a consistent pace without any unreasonable number and length of rest periods. (R. at 387.) She was mildly limited in her ability to maintain attention and concentration for extended periods of time and perform activities within a schedule, maintain regular attendance, and/or be punctual within customary tolerances. (Id.) She had no limitations in her ability to carry out very short and simple instructions, sustain ordinary routine without special supervision, and make simple work-related decisions. (Id.) However, in his psychological evaluation of Plaintiff, Mr. Atkinson noted that her concentration was

"markedly impaired" "based upon Arithmetic Raw Score of 7, Scale Score of 4 and Standard Score of 65." (R. at 399.) At no time did Mr. Atkinson explain this inconsistency.

As noted above, when considering Plaintiff's RFC, the ALJ determined that she could "perform no tasks requiring high levels of concentration or strict production quotas, and should only have occasional interaction with the public, supervisor, and co-workers." (R. at 19.) This determination is supported by substantial evidence in the form of Dr. Shaver's Psychiatric Review Technique and Mental Residual Functional Capacity Assessment; G. David Allen, Ph.D.'s agreement with Dr. Shaver's assessment; and Ms. Jones' assessment. Furthermore, these assessments provide substantial evidence for the ALJ's rejection of Mr. Levin's opinion regarding Plaintiff's concentration. Accordingly, the undersigned finds that substantial evidence supports the ALJ's assessment of Plaintiff's mental RFC.

### D. New Evidence

Plaintiff also contends that the Appeals Counsel erred by failing to remand her case to the ALJ for consideration of additional evidence regarding nerve impingement in her back and carpal tunnel syndrome in her left hand. (Plaintiff's Brief at 11-15.) Defendant asserts that this additional evidence would not have changed the ALJ's decision and that remand was therefore not necessary. (Defendant's Brief at 12-14.)

In Wilkins v. Sec'y, Dep't of Health & Human Servs., 953 F.2d 93, 95-96 (4th Cir. 1991), the Fourth Circuit determined that the Appeals Council must consider additional evidence that was not submitted to the ALJ if the evidence is (1) new, (2) material, and (3) relates to the period on or before the date of the ALJ's decision. "New evidence is evidence which is not duplicable or cumulative. Evidence is 'material' if there is a reasonable possibility that it would have changed the

outcome." Id. at 96. Evidence relates to the period on or before the date of the ALJ's decision if it provides evidence of a plaintiff's impairments at the time of the decision. See Johnson v. Barnhart, 434 F.3d 650, 655-56 (4th Cir. 2005).

Nerve Impingement

The evidence submitted to the Appeals Counsel indicated that Plaintiff underwent an MRI of her lumbar spine on May 1, 2012. (Exhibit 2 of Plaintiff's Brief, Docket 13-2, at 5.) Radiologist Mark Hackney noted that "[a]t the L4-L5 level, there is posterior disc bulge with left foraminal disc extrusion causing mild spinal stenosis and narrowing of both lateral recesses. There is moderate left foraminal stenosis with exiting nerve root impingement." (Id.) His impression was "[d]isc herniation with extrusion on the left side at L4-L5. There is exiting nerve root impingement upon the left L4 nerve root." (Id.) A handwritten note on the report stated "disc (cushion between bones) on low back [was] bulging & putting pressure on a nerve that goes to the legs (sciatic nerve)." (Id.)

A report may be new evidence even when the information contained in the report is similar to information already introduced. See Venters v. Astrue, No. TMD 08-1736, 2010 WL 481246, at *3 (D. Md. Feb. 4, 2010). An X-ray of Plaintiff's lumbar spine taken on October 11, 2010, noted that she had degenerative changes, particularly at L4-L5. (R. at 317, 369.) That same day, Dr. Watkins found that Plaintiff had tenderness and spasms along her lumbar spine. (R. at 314.) Seven days later, Dr. Nutter noted tenderness to palpation of Plaintiff paraspinal muscles on her lumbar spine. (R. at 265.) He also noted that while Plaintiff had range of motion abnormalities in her lumbar spine, his findings were "not consistent with nerve root compression." (Id.) The May 1, 2012 MRI of Plaintiff's lumbar spine, in contrast, not only shows degenerative changes at L4-L5, but also a "[d]isc herniation with extrusion on the left side at L4-L5. There is exiting nerve root

impingement upon the left L4 nerve root." (Exhibit 2 of Plaintiff's Brief, Docket No. 13-2 at 5.) Thus, the May 1, 2012 MRI is neither duplicative nor cumulative. As such, the undersigned finds that it is new under Wilkins.

The May 1, 2012 MRI also appears to be material. One facet of the ALJ's decision was to note that the objective evidence showed "minimal changes in [Plaintiff's back." (R. at 22 (alteration in original).) The findings from the May 1, 2012 MRI arguably present evidence of more than "minimal" changes to Plaintiff's lumbar spine. As such, it creates a conflict and calls into doubt the ALJ's analysis of the objective evidence regarding Plaintiff's physical impairments. Accordingly, the undersigned finds that this evidence is material under Wilkins.

Even so, the undersigned must consider whether this MRI should be considered because it was not done until approximately three months after the ALJ's decision. While the test clearly postdates the ALJ's decision, "Wilkins does not impose a bright line test based on the date of the test akin to a statute of limitations." Camper v. Barnhart, No. 7:04 CV 00403, 2005 WL 1995446, at *7 (W.D. Va. Aug. 16, 2005), amended 2005 WL 2105025 (W.D. Va. Aug. 29, 2005); see also Boggs v. Astrue, No. 2:12-cv-25, 2012 WL 5494566, at *5 (N.D. W. Va. Nov. 13, 2012) (applying Camper to determine that a test completed over three months after the ALJ's decision related "to the period of time the ALJ evaluated"). Rather, the issue becomes whether the new and material evidence "relat[es] to the period on or before the date of the ALJ decision." Wilkins, 953 F.2d at 95. The relation between the May 1, 2012 MRI and the period before the ALJ's decision is clear in this case, as the October 2010 X-ray noted problems, albeit less severe in the L4-L5 area. Given the short period of time between the ALJ's decision and the May 1, 2012 MRI, it is clear that the Commissioner needs to fully evaluate this evidence. Accordingly, the undersigned recommends that

Plaintiff's case be remanded to the Commissioner to weigh and resolve the conflicting evidence reflected in the May 1, 2012 lumbar spine MRI.

Carpal Tunnel Syndrome

The evidence submitted to the Appeals Council indicated that on April 27, 2012, Plaintiff visited Dr. Alghadban for a follow-up appointment. Plaintiff complained of experiencing numbness, tingling, and weakness in her upper extremities. (Exhibit 2 of Plaintiff's Brief, Docket No. 13-2, at 2.) She also complained of dropping things from her hand. (Id.) Dr. Alghadban noted that the EMG and nerve conduction study he had conducted on Plaintiff the previous October was "negative except for a mild degree of carpal tunnel syndrome." (Id.) He repeated the EMG and nerve conduction study. This study showed that Plaintiff had normal bilateral upper extremity muscles, normal bilateral ulnar motor and sensory responses, prolonged latency of the bilateral median palm wrist responses, and normal bilateral median motor responses. (Id. at 4.) Dr. Alghadban concluded, "This is an abnormal study. There is electrophysiological evidence of bilateral median focal mono neuropathy at the wrist level consistent with bilateral carpal tunnel syndrome mild in severity." (Id.) However, he believed that the results were "not severe enough to do surgery." (Id. at 2.) Dr. Alghadban continued Plaintiff's Lyrica prescription and instructed her to wear wrist splints. (Id.) He noted that if Plaintiff's symptoms became worse, he "might consider more aggressive treatment." (Id.)

This report contains information similar to information already included the record; nevertheless, it may still be new evidence. See Venters, 2010 WL 481246, at *3. On October 11, 2010, Plaintiff reported to Dr. Watkins that she had bilateral carpal tunnel syndrome, and Dr. Watkins diagnosed her with carpal tunnel syndrome and referred her to a neurologist for an EMG.

(R. at 314.)  On October 22, 2010, Dr. Mossallati completed an EMG nerve conduction study of Plaintiff's lower extremities, which was negative.  (R. at 270, 274.)  On February 21, 2011, Dr. Watkins requested that an EMG be performed on Plaintiff's upper extremities for her complaints of carpal tunnel syndrome.  (R. at 310.)  That same day, Dr. Watkins completed a Physical Residual Functional Capacity Questionnaire, in which she noted that Plaintiff had symptoms of bilateral carpal tunnel syndrome because of her "slightly diminished grip strength b/l," negative Tinel's sign, and positive Phalen's sign.  (R. at 323.)  On April 22, 2011, Dr. Alghadban examined Plaintiff for numbness and tingling in her upper extremities.  (R. at 383.)  He noted that the earlier EMG nerve conduction study was negative and that Plaintiff "showed no change from previous visits."  (Id.)  Dr. Alghadban conducted another EMG of Plaintiff's upper extremities on October 25, 2011.  (R. at 385.)  He concluded, "This is an abnormal study.  There is electrophysiological evidence of right medial focal mono neuropathy at the wrist level consistent with right carpal tunnel syndrome mild in severity."  (Id.)  The April 27, 2012 EMG nerve conduction study, in contrast, showed "electrophysiological evidence of bilateral median focal mono neuropathy at the wrist level consistent with bilateral carpal tunnel syndrome mild in severity." (Exhibit 13-2 of Plaintiff's Brief, Docket No. 13-2 at 4.)  Thus, the April 27, 2012 EMG study is neither duplicative nor cumulative. As such, the undersigned finds that it is new under Wilkins.

The April 27, 2012 EMG study also appears to be material.  The ALJ noted that the objective evidence showed that Plaintiff suffered from "mild right carpal tunnel syndrome" and therefore included this as one of Plaintiff's severe impairments.  (R. at 17, 22.)  The findings from the April 27, 2012 EMG study present evidence that Plaintiff suffers from carpal tunnel syndrome in both upper extremities, not just her right one.  As such, it creates a conflict and calls into doubt the ALJ's

analysis of the objective evidence regarding Plaintiff's physical impairments. Accordingly, the undersigned finds that this evidence is material under <u>Wilkins</u>.

Again, however, the undersigned must also consider whether this EMG study should be considered because it was not completed until a little over two months after the ALJ's decision. Like the May 1, 2012 MRI, the undersigned finds that the April 27, 2012 EMG study clearly "relat[es] to the period on or before the date of the ALJ decision." <u>Wilkins</u>, 953 F.2d at 95; <u>see also</u> <u>Boggs</u>, 2012 WL 5494566, at *5; <u>Camper</u>, 2005 WL 1995446, at *7. Given the short period of time between the ALJ's decision and the April 27, 2012 EMG study, it is clear that the Commissioner needs to fully evaluate this evidence. Accordingly, the undersigned recommends that Plaintiff's case be remanded to the Commissioner to weigh and resolve the conflicting evidence reflected in the April 27, 2012 EMG study.

### E. VE

Plaintiff also alleges that the VE's testimony does not provide substantial evidence to support the ALJ's decision that she could work because the VE "was not informed of all her limitations." (Plaintiff's Brief at 14.) Specifically, Plaintiff argues that the VE was never told in which hand she holds her cane. (<u>Id.</u> at 15.) Plaintiff also argues that clarification of her use of a cane is even more important when considering the April 27, 2012 EMG report showing that she suffers from mild bilateral carpal tunnel syndrome. (<u>Id.</u>) Accordingly, Plaintiff states, the Appeals Council should have remanded her case to the ALJ for consideration of whether she had limitations in handling with either hand. (<u>Id.</u>)

The undersigned has already found that the Appeals Council erred by not remanding Plaintiff's case to the ALJ for consideration of both the May 1, 2012 MRI of her lumbar spine and

the April 27, 2012 EMG report. Having already found that, it follows that substantial evidence does not support the hypothetical to the VE and the ALJ's reliance on the jobs identified by the VE.

## V. CONCLUSION

Upon consideration of all the above, the undersigned United States Magistrate Judge finds and concludes that substantial evidence does not support the ALJ's determination that Plaintiff was not disabled during the relevant time period, and recommends that the case be reversed and remanded for the Commissioner to take into consideration Plaintiff's May 1, 2012 MRI of her lumbar spine and her April 27, 2012 EMG nerve conduction study.

## VI. RECOMMENDED DECISION

For the reasons stated above, I find that the Commissioner's decision denying the Plaintiff's application for DIB is not supported by substantial evidence. I accordingly recommend the Defendant's Motion for Summary Judgment be **DENIED**, and the Plaintiff's Motion for Summary Judgment be **GRANTED IN PART** by reversing the Secretary's decision under sentence four[1] of 42 U.S.C. §§ 405(g) and 1383(c)(3), with a remand of the cause to the Secretary for further

---

[1]In her Memorandum in Support of Motion for Summary Judgment, Plaintiff asserts that if "the Court concludes that it cannot consider the May 2012 MRI report and the April 2012 EMG report . . . because these were not incorporated into the record by the Appeals Council, . . . remand for consideration of new and material evidence pursuant to the sixth sentence of 42 U.S.C. § 405(g) is appropriate." (Docket No. 13 at 13 n.3.) The undersigned does not agree. A district court may order a sentence six remand in two situations: "where the [Commissioner] requests a remand before answering the complaint, or where new, material evidence is adduced that was for good cause not presented before the agency." Shalala v. Schaefer, 509 U.S. 292, 297 n.2 (1993). Here, unlike the prototypical sentence six remand, the Appeals Council failed to consider new and material evidence that Plaintiff had presented to the Appeals Council but was not made a part of the record. Accordingly, the undersigned recommends remand under sentence four rather than sentence six. See Holley v. Astrue, 739 F. Supp. 2d 836, 839 (E.D.N.C. 2010) (remand under sentence four appropriate when Appeals Council failed to consider new and material evidence that the claimant had presented to it).

proceedings consistent and in accord with this Recommendation.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Irene M. Keeley, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to mail a copy of this Report and Recommendation to counsel of record.

Respectfully submitted this ___4___ day of _February_ 2014.

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE